AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>ROBERT A. GLAZER | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>14-0931M |

Complaint for violation of Title 18, United States Code, Section 1349

| NAME OF MAGISTRATE JUDGE<br>HONORABLE ANDREW J. WISTRICH | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>January 2006 – May 2014 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN)<br>8896 Lookout Mountain Ave., Los Angeles CA 90046 |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

## [18 U.S.C. § 1349]

Beginning in or about January 2006, and continuing through in or about May 2014, in Los Angeles County, within the Central District of California, and elsewhere, ROBERT A. GLAZER, M.D. ("GLAZER"), together with others known and unknown, knowingly combined, conspired, and agreed to commit health care fraud, in violation of Title 18, United States Code, Section 1347.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**JANINE LI** |
|---|---|
| | OFFICIAL TITLE<br>Special Agent – Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1]<br>ANDREW J. WISTRICH | DATE<br>May 12, 2014 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

DOJ Trial Attorney Fred Medick 202-674-5653      REC: Detention



**AFFIDAVIT**

I, JANINE LI, being duly sworn, hereby depose and state the following:

## I. INTRODUCTION

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and presently am assigned to the FBI's Los Angeles Division. I have been a Special Agent for more than seven years. I was trained at the FBI Academy in Quantico, Virginia. Presently, I am assigned to the Criminal Division, White Collar Crime – Organized Crime Health Care Fraud squad.

2. As an FBI agent, I have participated in various investigations pertaining to health care fraud, including investigations of Medicare fraud committed by home health agencies ("HHAs") and durable medical equipment ("DME") supply companies. I also have attended health care, general fraud, and white collar investigative training sponsored by the FBI and other law enforcement organizations. As a result of my training and experience, I am familiar with the federal laws relating to health care fraud, and common health care fraud techniques and schemes.

3. I am working jointly with SA Rochelle Wong of the U.S. Department of Health and Human Services, Office of Inspector General, Office of Investigation ("HHS-OIG-OI"), and FBI SA Camay Chu, in investigating ROBERT A. GLAZER, M.D. ("GLAZER").

## II. <u>PURPOSE OF THE AFFIDAVIT</u>

4.    This affidavit is made in support of a complaint charging GLAZER with conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349, and an arrest warrant for GLAZER.  Specifically, beginning in or around January 2006, and continuing through in or around May 2014, in Los Angeles County, within the Central District of California, and elsewhere, defendant GLAZER, together with others known and unknown, knowingly combined, conspired, and agreed to commit health care fraud, in violation of Title 18, United States Code, Section 1347.

5.    I am familiar with the facts and circumstances of this investigation.  I make this affidavit, in part, based upon personal knowledge derived from my participation in this investigation, and, in part, based upon information obtained from the following sources:

a.    Oral and written reports from other federal agents;

b.    Medicare claims data and records obtained from Medicare contractors;

c.    Interviews of various individuals, including Medicare beneficiaries;

d.    Records obtained through subpoenas, including bank records; and

2

e.   My training and experience in investigating Medicare fraud.

6.   This affidavit is offered for the sole purpose of establishing probable cause for the complaint and arrest warrant and does not purport to set forth all of the facts of the investigation.

### III.   PROBABLE CAUSE

**A.   The Medicare Program**

7.   Based on my training, experience, discussions with other agents and Medicare fraud investigators, and review of applicable laws and regulations, I am aware that Medicare is a federally-funded health care benefit program for the aged and disabled, which operates as described below.

8.   Medicare provides benefits to individuals who are over the age of 65 or disabled.  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.  Medicare is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

9.   Individuals who qualify for Medicare benefits are referred to as Medicare "beneficiaries."  Each beneficiary is given a unique health identification card number ("HICN").

10.  HHAs, DME supply companies, physicians, and other health care providers that provide medical services that are

3

reimbursed by Medicare are referred to as Medicare "providers." To participate in Medicare, providers are required to submit an application in which the provider agrees to comply with all Medicare-related laws and regulations. If Medicare approves a provider's application, Medicare assigns the provider a Medicare "provider number," which is used for processing and payment of claims.

11.   A health care provider with a Medicare provider number can submit claims to Medicare to obtain reimbursement for services rendered to beneficiaries.

12.   Most providers submit their claims electronically pursuant to an agreement they execute with Medicare in which the providers agree that they are responsible for all claims submitted to Medicare by themselves, their employees, and their agents; that they will submit claims only on behalf of those Medicare beneficiaries who have given their written authorization to do so; and that they will submit claims that are accurate, complete, and truthful.

13.   Medicare generally reimburses a provider for DME only if the DME is prescribed by the beneficiary's physician, the DME is medically necessary to the treatment of the beneficiary's illness or injury, and the DME supplier provides the DME in accordance with Medicare regulations and guidelines that govern

whether a particular item or service will be reimbursed by Medicare.

14.   Medicare generally reimburses a provider for home health services only if, among other requirements, the Medicare beneficiary is homebound and does not have a willing caregiver to assist him or her; the beneficiary needs skilled nursing services or physical or occupational therapy services; the beneficiary is under the care of a qualified physician who establishes a Plan of Care (CMS Form 485) for the beneficiary, signed by the physician and also signed by a registered nurse ("RN"), physical therapist ("PT"), or occupational therapist ("OT"), from the HHA; and the skilled nursing services or physical or occupational therapy are medically necessary.

15.   To determine the proper level of care for a particular beneficiary and ultimately to help determine the amount of payment, Medicare requires that HHAs perform an initial evaluation, which is a patient-specific comprehensive assessment that accurately reflects the patient's current health and provides information to measure his progress.

16.   In making this assessment, HHAs are required to use a tool called the Outcome and Assessment Information Set ("OASIS").  The standard OASIS form is a detailed checklist on which a nurse examining a prospective home health patient checks off applicable boxes as he or she examines and interviews the

patient face-to-face regarding every aspect of the patient's physical and mental health, history, and living conditions.

17.   Medicare requires that the initial assessment be performed and the OASIS completed and signed by an RN (or PT or OT if only therapy services are to be provided).

18.   Medicare also requires that a HHA maintain a clinical record of services to each beneficiary, including signed and dated clinical and progress notes recording each home visit made to the beneficiary.  While the form of progress notes may vary, all progress notes must contain the identity of the HHA employee who performed the visit, the name of the patient, and the type of service performed.

19.   Medicare compensation to HHAs is based on a prospective payment system ("PPS"), under which Medicare pays HHAs a base payment that is adjusted based on the severity of the beneficiary's health condition and care needs as represented by the OASIS data.

20.   Under PPS, HHAs are paid in two steps for each 60-day episode of care to a given beneficiary.  At the outset of an episode, the HHA submits a Request for Anticipated Payment ("RAP") identifying the applicable PPS payment category (based on the severity of the patient's condition and needs as computed from the OASIS data) and receives 50-60% of the anticipated total payment for that category.  At the conclusion of the

episode, the agency submits a final claim for payment, reporting the actual number, length, and type of visits made.  Assuming a certain threshold number of visits are reported as having been made, the agency receives the remaining 40%-50% of the PPS payment.

21.  Under this system, a provider may receive a payment for the episode higher than the amount of its claim.

22.  CMS contracts with regional contractors to process and pay Medicare claims.  Noridian Administrative Services ("Noridian") is the contractor that processed and paid Medicare DME claims in Southern California during the relevant time period.  Noridian is the contractor that processed claims involving Medicare Part B physician services in Southern California from approximately September 2013 to the present.  Prior to Noridian, the contractor for Part B physician services was Palmetto GBA from 2009 to 2013.  Prior to Palmetto GBA, the contractor for Part B physician services was National Health Insurance Company from 2006 to 2009.  National Government Services ("NGS") is the contractor that processed and paid Medicare claims for home health services in Southern California during the relevant time period.

23.  To bill Medicare for physician services or DME, a provider submits a claim form (Form 1500) to Noridian.  To bill Medicare for home health services, a provider submits a claim

form (Form UB-04) to NGS.  When a Form 1500 or Form UB-04 is submitted, usually in electronic form, the provider certifies:

    a.   the contents of the form are true, correct, and complete;

    b.   the form was prepared in compliance with the laws and regulations governing Medicare; and

    c.   the services being billed are medically necessary.

24.  A Medicare claim for payment is required to set forth, among other things, the following: the beneficiary's name and unique Medicare identification number; the type of services provided to the beneficiary; the date that the services were provided; and the name and Unique Physician Identification number ("UPIN") of the physician who prescribed or ordered the services.

**B.   Ownership of the GLAZER Clinic**

25.  Based on my conversations with other agents and my review of Medicare and bank records, I am aware of the following:

    a.   According to a private database search of public records that I performed on February 27, 2014, GLAZER is the sole proprietor of the medical clinic located at 5250 Santa Monica Blvd., Suite 208, Los Angeles, California 90029 (the "GLAZER clinic").

b.   A provider enrollment application (CMS Form 855) was submitted to Medicare for the GLAZER clinic on February 26, 2007, listing GLAZER as the owner and sole contact for the GLAZER clinic.  GLAZER's name is signed in the enrollment application's certification section.  In this section, GLAZER certified that the clinic would only submit claims that were accurate, complete, and truthful.

c.   The GLAZER clinic was subsequently assigned Medicare provider number 1447300504, with an enumeration date of January 11, 2007.

d.   As a part of the GLAZER clinic's provider enrollment process, GLAZER signed an Electronic Funds Transfer Authorization Agreement ("EFT") on March 5, 2007, for the GLAZER clinic to receive payment from Medicare electronically into the GLAZER clinic's business bank account, Citibank account number **** 1565, on which GLAZER is the sole signatory.

C.   **GLAZER Engaged in a Conspiracy to Exploit Medicare Beneficiaries and Defraud Medicare**

26.   The evidence indicates that GLAZER and his co-conspirators recruited Medicare beneficiaries for three purposes.  First, GLAZER billed Medicare for services that were not actually provided to the beneficiaries.  Second, GLAZER received kickbacks in exchange for signing home health certifications (Forms 485) for services that were not medically

9

necessary.   These certifications were then provided to home health companies, which fraudulently billed Medicare for home health services and visits that were not medically necessary and many of which did not actually occur.   Third, GLAZER received kickbacks in exchange for signing prescriptions for DME, primarily power wheelchairs ("PWCs"), that was not medically necessary.   These prescriptions were then provided to DME supply companies, which fraudulently billed Medicare.

27.   The evidence described below includes:

a.   statements of CW-1, a former marketer for the GLAZER clinic who has intimate knowledge of how the clinic works;

b.   statements of 17 separate Medicare beneficiaries, who, depending on the beneficiary, say that they did not want, need, or receive: (1) services for which the GLAZER clinic billed Medicare; (2) DME, particularly PWCs, prescribed by GLAZER; or (3) home health services prescribed by GLAZER; and

c.   analysis of claims data for the GLAZER clinic and a related HHA, which show numerous indicators of fraud, including a high percentage of billings for suspicious services such as subcutaneous injection of allergens; a high volume of PWC prescriptions; and a high rate of referrals to a single HHA.

Statements of CW-1[1], Former Marketer for the GLAZER Clinic

28.  On August 9, 2013, and February 19, 2014, among other dates, other law enforcement agents and I conducted interviews of CW-1, and learned the following:

a.  CW-1 worked as a marketer at the GLAZER clinic from approximately 2010 until 2012 or 2013.  CW-1 brought roughly 20 beneficiaries per month to the clinic, and was paid per beneficiary.  At the clinic, GLAZER billed Medicare for procedures that were medically unnecessary, and that often were not performed.  In addition, GLAZER wrote medically unnecessary prescriptions for DME and home health care, which were sold to providers who then used the prescriptions to submit claims to Medicare.

b.  CW-1 and the other marketers called the GLAZER clinic to check beneficiaries' Medicare eligibility before the marketers brought the beneficiaries to the clinic.

c.  When CW-1 and the beneficiaries arrived at the clinic, the beneficiaries got forms to fill out and sign.  Some of the forms were for allergy tests that GLAZER billed to Medicare but did not actually perform.[2]

_____

[1] CW-1 has signed a plea agreement and is cooperating with the government.
[2] These tests, subcutaneous injections of allergens, are described in greater detail in paragraph 15.j. below.

d.    The clinic had several examination rooms.  The first room was for blood draws.  The next room was for EKGs. Another room had an ultrasound machine.

e.    Typically, the beneficiaries' final stop was at GLAZER's office.  The beneficiaries usually spent about ten minutes in GLAZER's office, which had a desk, a computer, and shelves.  It did not have an examination area.  This was the only location where GLAZER interacted directly with the beneficiaries.

f.    GLAZER spoke Spanish, so CW-1 usually did not accompany the beneficiaries into GLAZER's office.  When CW-1 did accompany the beneficiaries, GLAZER spoke with the beneficiaries, but did not examine them in any way.

g.    When CW-1 did not accompany the beneficiaries, CW-1 usually waited in the kitchen across the hall.  GLAZER's office door usually was left slightly open, so CW-1 was able to hear GLAZER's conversations with the beneficiaries.  CW-1 heard GLAZER talking with the beneficiaries about their medications, and CW-1 heard him prescribing new medications.  CW-1 never observed anything suggesting that GLAZER was examining the beneficiaries.

h.    Generally, GLAZER prescribed DME, primarily PWCs, and/or home health care for the beneficiaries.  GLAZER did not give the prescriptions to the beneficiaries.

i.   Billing records show that GLAZER submitted numerous claims to Medicare for subcutaneous injections of allergens.   CW-1 never saw GLAZER or anyone else at the clinic actually performing this procedure.

j.   At times, the beneficiaries were not told that they were being prescribed home health care or PWCs.   At other times, the beneficiaries told CW-1 that they did not want home health care.

k.   Generally, GLAZER prescribed home health care for eight to ten weeks.   A nurse was supposed to go to the beneficiary's home once or twice a week, but usually only went about three times total.   CW-1 knew this because she stayed in touch with the beneficiaries after she brought them to the GLAZER clinic.

l.   Different HHAs paid different amounts for beneficiaries.   Usually home health companies paid cash, but sometimes they paid by check.

Statements of Medicare Beneficiaries

29.   Between approximately 2010 and 2014, investigators from Safeguard Services, LLC, ("SGS"), a program integrity contractor for Medicare, FBI SAs, and HHS-OIG SAs, interviewed numerous Medicare beneficiaries purportedly treated by GLAZER. GLAZER submitted claims to Medicare for many of these beneficiaries.   For some beneficiaries, an HHA submitted claims

to Medicare for home health services prescribed by GLAZER; and DME supply companies submitted claims to Medicare for PWCs based on prescriptions signed in GLAZER's name.

30.   This affidavit includes descriptions of 17 such beneficiaries.  For 15 of the 17 beneficiaries, GLAZER submitted claims to Medicare for services that were not provided.  For six of the 17 beneficiaries, an HHA submitted claims to Medicare for home health visits prescribed by GLAZER that the beneficiaries did not want or need, and that often did not occur.  For five of the 17 beneficiaries, Fifth Avenue Home Health ("Fifth Avenue") submitted claims to Medicare for home health visits that the beneficiaries did not want or need, and that often did not occur.  Finally, for eight of the 17 beneficiaries, DME supply companies submitted claims to Medicare for PWCs that were not medically necessary, based on prescriptions signed in GLAZER's name.

<u>Medicare Beneficiary R.M.C.</u>

31.   R.M.C. contacted SGS on May 17, 2013.  R.M.C. stated that the GLAZER clinic submitted claims to Medicare for services purportedly provided to R.M.C., when in reality the services were not provided.

32.   Medicare records reflect that the GLAZER clinic submitted seven claims to Medicare for services purportedly provided to R.M.C. on April 10, 2013, and April 12, 2013.  These

services include, among others, EKGs, various ultrasound procedures, and removal of impacted ear wax.  These claims totaled $1,381.00 in billings, and Medicare paid $662.97 to the GLAZER clinic.

33.  SGS contacted the GLAZER clinic and requested additional documentation supporting the GLAZER clinic's claims that R.M.C. received services at the clinic.  In response, the GLAZER clinic failed to provide any documentation.  Accordingly, SGS requested recoupment of Medicare's payments from the GLAZER clinic.

34.  Agents interviewed R.M.C., and she told them that she did not receive an EKG, any ultrasounds, or any removal of impacted ear wax from anyone at the GLAZER clinic.

Medicare Beneficiary J.R.

35.  J.R.'s daughter contacted SGS on September 29, 2010. J.R.'s daughter stated that the GLAZER clinic submitted claims to Medicare for services purportedly provided to J.R. on June 29, 2010, when in reality the services were not provided.

36.  Medicare records reflect that the GLAZER clinic submitted claims to Medicare for nine services purportedly provided to J.R. on June 29, 2010.  These services include, among others, subcutaneous injection of allergens, EKGs, and various ultrasound procedures.  These claims totaled $2390.00 in billings, and Medicare paid $1,282.94 to the GLAZER clinic.

15

37.   SGS contacted the GLAZER clinic and requested additional documentation supporting the GLAZER clinic's claims that J.R. received services at the clinic.  The GLAZER clinic responded that it did not have any documentation pertaining to J.R.  Accordingly, SGS sent the claim for adjustment.

38.   Agents interviewed J.R., and he told them that he did not receive subcutaneous injection of allergens or ultrasounds from the GLAZER clinic.

Medicare Beneficiary M.G.

39.   M.G. contacted SGS on November 17, 2010.  M.G. stated that the GLAZER clinic submitted claims to Medicare for services purportedly provided to M.G., when in reality the services were not provided.

40.   Medicare records reflect that the GLAZER clinic submitted claims to Medicare for 11 services purportedly provided to M.G. on July 2, 2010, July 14, 2010, June 24, 2011, and September 9, 2011.  These services include, among others, subcutaneous injection of allergens, EKGs, bone density tests, and various ultrasound procedures.  These claims totaled $2,085.00 in billings, and Medicare paid $1,071.99 to the GLAZER clinic.

41.   SGS contacted the GLAZER clinic and requested additional documentation supporting the GLAZER clinic's claims that M.G. received services at the clinic.  In response, the

GLAZER clinic failed to provide any documentation. Accordingly, SGS requested recoupment of Medicare's payments from the GLAZER clinic.

42. Agents interviewed M.G., who told them that she did not receive any ultrasound procedures, subcutaneous injection of allergens, or bone density tests from the GLAZER clinic.

Medicare Beneficiary A.G.

43. A.G. contacted SGS on February 3, 2012. A.G. stated that the GLAZER clinic submitted claims to Medicare for services purportedly provided to A.G., when in reality the services were not provided.

44. Medicare records reflect that the GLAZER clinic submitted claims to Medicare for eight services purportedly provided to A.G. on July 27, 2011. These services include, among others, subcutaneous injection of allergens, EKGs, removal of impacted ear wax, and various ultrasound procedures. These claims totaled $2,015.00 in billings, and Medicare paid $0.00 to the GLAZER clinic.[3]

45. Agents interviewed A.G., who told them that he did not receive subcutaneous injection of allergens, EKGs, removal of impacted ear wax, or ultrasounds from the GLAZER clinic.

---

[3] Apparently, the GLAZER CLINIC later received some payment for this beneficiary.

Medicare Beneficiary M.I.V.

46.   M.I.V. received a phone call sometime around the beginning of 2011 from someone claiming to be from Medicare. The caller arranged for M.I.V. to be picked up and taken to a medical clinic.  At the clinic, nurses gave her an ultrasound and an examination.  She saw a doctor, but he did not examine her.

47.   A few weeks later, a nurse came to her door claiming to be from the doctor's office and stayed for about 30 minutes. M.I.V. told the nurse not to come again because she did not need the nurse's services.  M.I.V. is not homebound; in fact, she drives her car to her doctor's appointments.

48.   Medicare records reflect that the GLAZER clinic submitted claims to Medicare for seven services purportedly provided to M.I.V. on November 12, 2010, December 1, 2010, and July 22, 2011.  These services include, among others, removal of impacted ear wax, EKGs, and lung capacity measurement.  These claims totaled $595.00 in billings, and Medicare paid $181.71 to the GLAZER clinic.  M.I.V. advised agents that she only visited the GLAZER clinic once, did not receive removal of impact ear wax, and did not recall receiving a lung capacity measurement from GLAZER or anyone else at his clinic.

49.   Medicare records also reflect that Unique Home Health, Inc. ("Unique") submitted a claim to Medicare reporting 11 home

health visits to M.I.V. between July 23, 2011, and September 16, 2011, based on a certification from GLAZER.  Medicare paid Unique $2,325.77 on this claim.

Medicare Beneficiary J.O.

50.  J.O. stated that she is not homebound.  On the contrary, she goes to church and has a cart to pull potatoes and water.

51.  J.O. received numerous phone calls asking her go to a medical clinic.  The caller offered her free shoes, oil, rice, and beans.  At first, she refused.  Later, she acquiesced.  Once at the clinic, she waited for a long time.  She became hungry and asked to be taken home, but she was asked to keep waiting.

52.  Eventually, she saw GLAZER.[4]  He did not examine her. He talked to her for about 10 minutes, and she never saw him again.

53.  At the clinic, a nurse offered her a sonogram, but she refused.  The nurse told her she could go home if she agreed to get the sonogram, so she got the sonogram.

54.  A few weeks after the office visit, a nurse arrived at J.O.'s residence and checked her blood pressure, ear temperature, and oxygen level.  After about three visits, J.O. told the nurse to stop coming.

---

[4] J.O. positively identified Glazer through a photograph shown to her by agents during her interview.

55.   Medicare records reflect the GLAZER clinic submitted claims to Medicare for six services purportedly provided to J.O. on October 10, 2011.  These services include, among others, subcutaneous injection of allergens, removal of impact ear wax, and various ultrasound procedures.  These claims totaled $1,855.00 in billings, and Medicare paid $1,107.53 to the GLAZER clinic.  In reality, J.O. did not receive subcutaneous injection of allergens or impacted ear wax removal.

56.   Medicare records also reflect that Unique submitted a claim to Medicare reporting five home health visits to J.O. between October 22, 2011, and November 22, 2011, based on a certification from GLAZER.  Medicare paid Unique $2,325.77 on that claim.

Medicare Beneficiary M.V.

57.   M.V. lives on the second floor of an apartment building with no elevator.  She walks with the assistance of a cane and runs errands by herself, or gets help from her daughter.

58.   M.V. met a woman who took her to the GLAZER clinic. At the GLAZER clinic, nurses examined M.V., and she saw GLAZER. M.V. was told she could get a free PWC.  The woman gave M.V. a ride home, and M.V. never saw GLAZER again.

59.   M.V. received a PWC, even though she lived on the second floor with no elevator.  At the time of her interview,

20

M.V. had a PWC that was stored in the corner of her apartment and which was covered.  M.V. does not use the PWC.

60.  M.V. also received home health visits once a week for about 3 months.  The people who came to give her home health had her sign documents, which were in English.  She did not understand the documents because she could not read English.

61.  Medicare records reflect that the GLAZER clinic submitted claims to Medicare for nine services purportedly provided to M.V. on December 28, 2010, and January 4, 2011. These services include, among others, subcutaneous injection of allergens, an EKG, pure tone air conduction, and various ultrasound procedures.  These claims totaled $2,015.00 in billings, and Medicare paid $1,066.09 to the GLAZER clinic.  In reality, M.V. only went to the GLAZER clinic once and did not receive a subcutaneous injection of allergens.

62.  Medicare records also reflect that Unique submitted a claim to Medicare reporting 22 home health visits to M.V. between January 4, 2011, and March 3, 2011, based on a certification from GLAZER.  Medicare paid Unique $4,754.73 on this claim.

63.  Medicare records reflect that on December 28, 2010, Colonial Medical Supply ("Colonial") billed M.V.'s Medicare account $5,457.37, and Medicare paid $3,709.04 for a PWC and related accessories prescribed by GLAZER.

Medicare Beneficiary M.O.

64. M.O. has never seen GLAZER or been to the GLAZER clinic, or any medical clinic on Santa Monica Blvd. in Los Angeles (which is where the GLAZER clinic is located).   At one point, she was taken to a medical clinic by a woman who offered her a free blender.

65. Two nurses came to her home and said they were there on behalf of a doctor, but they did not specify which doctor. They visited M.O.'s home three times; after that, she told them to stop coming because they only took her blood pressure and were not helping her.

66. Medicare records reflect that the GLAZER clinic submitted claims to Medicare for five services purportedly provided to M.O. on December 9, 2010, and February 9, 2011. These services include, among others, subcutaneous injection of allergens, an EKG, and removal of impacted ear wax.  These claims totaled $1,190.00 in billings, and Medicare paid $579.66 to the GLAZER clinic.  M.O. advised agents that when she went to the doctor's office, she definitely did not receive subcutaneous injection of allergens or removal of impact ear wax.

67. Medicare records also reflect that Unique submitted claims to Medicare reporting 23 home health visits to M.O. between December 11, 2010, and March 24, 2011, based on a

certification from GLAZER.  Medicare paid Unique $4,627.02 on these claims.

### Medicare Beneficiaries H.A. and O.A.

68.  In approximately 2010, someone called H.A. and O.A.'s home and said they would get a PWC if they went to a clinic for a physical exam.  The caller told them that they had to get their PWCs now because they were the last ones of the year.  At the clinic, they saw a nurse and a doctor.  The doctor checked O.A.'s blood pressure and drew some blood.  He did not say anything about a PWC.

69.  About a month later, two PWCs were delivered.  H.A. and O.A. have never used the PWCs.  Nurses visited them two or three times.  When the nurses visited, they stayed for 15 or 20 minutes.

70.  Medicare records reflect that the GLAZER clinic submitted claims to Medicare for eight services purportedly provided to H.A. on December 7, 2010.  These services include, among others, electronic assessment of bladder emptying, an EKG, and various ultrasound examinations.  These claims totaled $989.60 in billings, and Medicare paid $792.28 to the GLAZER clinic.  In reality, H.A. did not receive an electronic

assessment of bladder emptying, EKGs, or ultrasound examinations.[5]

71.   Medicare records reflect that the GLAZER clinic submitted claims to Medicare for eight services purportedly provided to O.A. on December 7, 2010.  These services include, among others, subcutaneous injection of allergens, removal of impacted ear wax, and various ultrasound examinations.  These claims totaled $2,100.00 in billings, and Medicare paid $538.86 to the GLAZER clinic.  O.A. did not actually receive any subcutaneous injections of allergens or ultrasound examinations.[6]

72.   Medicare records also reflect that Unique submitted a claim to Medicare reporting eight home health visits to H.A. between December 12, 2010, and January 4, 2011, based on a certification from GLAZER.  Medicare paid Unique $2,313.51 on this claim.  Medicare records also reflect that Unique submitted a claim to Medicare reporting seven home health visits to O.A. between December 12, 2010, and January 4, 2011, based on a certification from GLAZER.  Medicare paid Unique $2,313.51 on this claim.

73.   Medicare records reflect that on December 13, 2010, Colonial billed H.A.'s Medicare account $5,457.37, and Medicare paid $3,709.05 for a PWC and related accessories allegedly prescribed by GLAZER.  Medicare records also reflect that on

---

[5] Agents were not able to ask H.A. directly, but her grandson told agents that H.A. did not receive these procedures.
[6] Agents were not able to ask O.A. directly, but his grandson told agents that O.A. did not receive these procedures.

December 13, 2010, Colonial billed O.A.'s Medicare account $5,457.37, and Medicare paid $3,709.05 for a PWC and related accessories allegedly prescribed by GLAZER.

Medicare Beneficiaries S.V. and J.V.

74.   In approximately 2010, a woman named Marta came to S.V. and J.V.'s residence several times.   Marta tried to convince them to accompany her to a doctor's clinic.   Marta told them they would receive free medical supplies, such as a cane. Eventually, they agreed.   They went to see Glazer, who gave them a quick checkup.[7]   In the days following the visit, S.V. and J.V. received various DME that they did not request, want, need, or use.

75.   In addition, a nurse visited once or twice a week for about a month.   The nurse checked S.V.'s blood pressure and glucose level, despite the fact that S.V. could do it herself. In addition, a physical therapist visited twice a week for a month and made S.V. walk for about 15 minutes.

76.   When Marta returned to ask them if they wanted more items, they told her to stop coming back because they did not want or need the items.

77.   S.V. and J.V. subsequently received Medicare Summary Notices showing that they made multiple visits to GLAZER, even though in actuality J.V. only saw him once, and S.V. saw him

---

[7] S.V. and J.V. identified GLAZER by name but did not recognize his DMV photo.

once or possibly twice.  They called the GLAZER clinic and said to stop billing Medicare or they would report him.

78.  Medicare records reflect that the GLAZER clinic submitted claims to Medicare for nine services purportedly provided to S.V. on October 8, 2009, December 7, 2009, January 4, 2011, May 27, 2011, and July 25, 2011.  These services include, among others, electronic assessment of bladder emptying, an EKG, and removal of impacted ear wax.  These claims totaled $800.00 in billings, and Medicare paid $0.00 to the GLAZER clinic.[8]  S.V. did not receive an electronic assessment of bladder emptying or removal of impacted ear wax.

79.  Medicare records reflect that the GLAZER clinic submitted claims to Medicare for eight services purportedly provided to J.V. on October 8, 2009, December 9, 2009, August 3, 2010, December 1, 2010, and May 27, 2011.  These services include, among others, subcutaneous injection of allergens, measurement of lung capacity, an EKG, and a home visit.  These claims totaled $1,420.00 in billings, and Medicare paid $0.00 to the GLAZER clinic.[9]  J.V. only saw Glazer once and did not receive a lung capacity test, subcutaneous injection of allergens, or a home visit.

80.  Medicare records also reflect that Fifth Avenue submitted claims to Medicare reporting 21 home health visits to

[8] The GLAZER CLINIC later received some payment for this beneficiary.
[9] The GLAZER CLINIC later received some payment for this beneficiary.

S.V. between May 27, 2011, and September 8, 2011, based on a certification from GLAZER. Claims submitted by Fifth Avenue on behalf of S.V. totaled $2,850.00 in billings, and Medicare paid $5,079.22 to Fifth Avenue. Medicare records also reflect that Fifth Avenue submitted a claim to Medicare reporting 15 home health visits to J.V. between May 27, 2011, and July 11, 2011, based on a certification from GLAZER. Claims submitted by Fifth Avenue on behalf of J.V. totaled $2,025.00 in billings, and Medicare paid $2,576.61 to Fifth Avenue. S.V. and J.V. are not homebound.

81. Medicare records also reflect that on October 27, 2009, and August 5, 2010, Ortho Medical Supply ("Ortho") billed S.V.'s Medicare account $898.00, and Medicare paid $544.76 for a walker, a heating pad, a back brace, diabetic shoes, and diabetic shoe inserts allegedly prescribed by GLAZER. Medicare records also reflect that on October 27, 2009, and August 5, 2010, Ortho billed J.V.'s Medicare account $678.00, and Medicare paid $494.63 for knee braces, a walker, diabetic shoes, and diabetic shoe inserts allegedly prescribed by GLAZER.

Medicare Beneficiary M.V.L.

82. M.V.L. advised agents that several years ago, a woman came to her door and told her that she could get a free PWC. The woman drove her to a clinic, where she saw a doctor. The doctor checked her weight and told her she would get a PWC.

83.   On a later date, M.V.L. received a PWC and a back brace.  In addition, someone from the doctor's clinic called to tell her that the clinic was sending a nurse.  M.V.L. said that she did not want or need a nurse, and would not accept one.

84.   Medicare records reflect that the GLAZER clinic submitted claims to Medicare for five services purportedly provided to M.V.L. on May 12, 2010, July 27, 2010, and June 7, 2011.  These services include, among others, an EKG and one home visit.  These claims totaled $555.00 in billings, and Medicare paid $246.77 to the GLAZER clinic.  M.V.L. advised agents that she only saw the doctor once, did not receive an EKG, and did not receive a home visit.

85.   Medicare records reflect that on June 30, 2010, Ortho billed M.V.L.'s Medicare account $680.00, and Medicare paid $526.12 for a back brace, bi-lateral knee braces, and a heating pad allegedly prescribed by GLAZER.  M.V.L. did not need or use the back brace, and did not receive the knee braces or heating pad.

86.   Medicare records reflect that on June 3, 2010, Ibon Inc.[10] ("Ibon") billed M.L.V.'s Medicare account $5,251.51, and Medicare paid $2,894.16 for a PWC and related accessories allegedly prescribed by GLAZER.

---

[10] Ibon was a fraudulent DME supply company owned by Brooke Agbu ("Brooke"), Charles Agbu's daughter.  On July 19, 2013, Brooke was convicted at trial in U.S. v. Charles Agbu, et al, Case No. CR 11-134(A)-GW, of health care fraud resulting from her ownership of Ibon.

87.   Medicare records also reflect that Fifth Avenue submitted a claim to Medicare reporting eight home health visits to M.V.L. between June 8, 2011, and July 12, 2011, based on a certification from GLAZER.   This claim totaled $1,080.00 in billings, and Medicare paid $2,539.61 to Fifth Avenue.   M.V.L. advised agents that a nurse came to her residence two times. The second time, M.L.V.'s daughter told the nurse not to return.

<u>Medicare Beneficiary T.S.</u>

88.   A woman took T.S. to a medical clinic to see if he qualified to see a doctor.   At the clinic, T.S. was told that he did not qualify, so he could not see the doctor.   T.S. started receiving home visits from a nurse.   The nurse came once a week for about three months.

89.   Medicare records reflect that the GLAZER clinic submitted claims to Medicare for 12 services purportedly provided to T.S. on December 3, 2010, June 15, 2011, August 12, 2011, December 30, 2011, May 30, 2012, and July 2, 2012.   These services include, among others, lung capacity measurement, a blood draw, and various ultrasound examinations.   These claims totaled $1,690.00 in billings, and Medicare paid $736.58 to the GLAZER clinic.   T.S. advised agents that he only went to a clinic once, never saw the doctor at all, and did not receive any lung capacity measurements, blood draws, or ultrasound examinations.

90.   Medicare records also reflect that Fifth Avenue submitted claims to Medicare reporting 21 home health visits to T.S. between June 15, 2011, and October 5, 2011, based on a certification from Glazer.  Claims submitted by Fifth Avenue on behalf of M.V.L. totaled $2,835.00 in billings, and Medicare paid $5,079.22 to Fifth Avenue.  T.S. advised that he is not homebound; he does not need assistance leaving his house; he is able to exercise and do everything himself; and he walks without assistance and does not need help.  In fact, T.S. advised that he goes walking outside everyday in the morning.

91.   Medicare records reflect that on December 6, 2010, Ortho billed T.S.'s Medicare account $365.00, and Medicare paid $290.62 for a back brace allegedly prescribed by GLAZER.  T.S. never received a back brace or any other DME.

Medicare Beneficiary J.B.M.

92.   J.B.M. received a call from a woman who offered her a free recliner and shoes.  J.B.M. was driven to a medical clinic in Los Angeles.  At the clinic, she saw the doctor.  Her blood pressure was checked, her blood was drawn, and she received an EKG.  Approximately one month after J.B.M. saw the doctor, nurses started coming to her house.  The nurses came twice a week.

93.   Medicare records reflect that the GLAZER clinic submitted claims to Medicare for eight services purportedly

provided to J.B.M. on January 19, 2011, and February 17, 2011. These services include, among others, subcutaneous injection of allergens, an EKG, a blood draw, and various ultrasound examinations. These claims totaled $1,920.00 in billings, and Medicare paid $0.00 to the GLAZER clinic. J.B.M. advised agents that she only saw GLAZER once, and she did not receive subcutaneous injection of allergens or ultrasound examinations from him or anyone else.

94. Medicare records also reflect that Fifth Avenue submitted a claim to Medicare reporting 18 home health visits to J.B.M. between February 17, 2011, and April 13, 2011, based on a certification from GLAZER. This claim totaled $2,535.00 in billings, and Medicare paid $3,757.67 to Fifth Avenue. J.B.M. is not homebound; she walks and exercises.

95. Medicare records reflect that on January 22, 2011, Ortho billed J.B.M.'s Medicare account $2,096.00, and Medicare paid $1,638.94 for a heating pad and a TENS unit allegedly prescribed by GLAZER; and on March 29, 2011 for a bi-lateral knee braces and bi-lateral ankle braces allegedly prescribed by GLAZER. J.B.M. received a back brace and a TENS unit, but did not receive a heating pad, bi-lateral knee braces, or bi-lateral ankle braces.

Medicare Beneficiary C.M.

96.   C.M. advised agents that a neighbor told her she could get free food if she went to a medical clinic.  Later, a Hispanic female picked her up and drove her to a medical clinic far away.

97.   At the clinic, C.M. submitted her Medicare card and signed some paperwork.  She saw a doctor, but the doctor did not examine her.  Two weeks after the visit, a woman brought her food.  The woman told her that if she returned to the clinic, someone would come to her house to help her exercise.  C.M. refused.

98.   About a month after the visit, C.M. received a PWC. She did not ask for a PWC, and she did not know she would be getting one until it arrived.  C.M. has never used the PWC.  In fact, C.M. walks each day for about 30 minutes.

99.   C.M.'s primary care physician confirmed that C.M.'s patient file showed no request for a PWC or any indication that she had mobility issues.

100. Medicare records reflect that the GLAZER clinic billed C.M.'s Medicare account $2,110.00 and Medicare paid $264.00 for various services purportedly performed on December 17, 2010, and May 27, 2011.  These services include, among others, subcutaneous injection of allergens and pure tone threshold hearing assessments.

101. Medicare records also reflect that on December 20, 2010, Colonial billed C.M.'s Medicare account $5,457.37 and Medicare paid $3,709.04 for a PWC and related accessories prescribed by GLAZER.

<u>Documentary Evidence</u>

102. Agents received a report that detailed GLAZER's Medicare claims data from the period of January 1, 2006, through April 30, 2014.  The report showed the following:

    a.    During that time period, GLAZER billed Medicare approximately $1,993,396 on behalf of 2,282 beneficiaries.  As of May 2014, Medicare paid GLAZER approximately $735,433 for that time period.

    b.    The plurality of GLAZER's billings, 14.99% of total billings, is for procedure code 95004, Injection of allergenic extracts into skin for immediate reaction analysis. GLAZER billed for 30,160 of these injections, for 345 beneficiaries.  Based on my experience and training, as well as conversations with medical professionals and other investigators, I know that injections of allergenic extracts is an uncommon procedure that should only be used in specific circumstances.  The number of procedures supposedly occurring at the GLAZER clinic, as well as the high percentage of overall billings, are indicators of fraud.  Further, the beneficiaries

indicated that these procedures were not actually performed at all.

c.   In addition, GLAZER billed for approximately 12 different ultrasound codes, totaling 26.56% of total billings, for 1,807 separate ultrasounds.  Based on my experience and training, as well as conversations with medical professionals, beneficiaries, and other investigators, it is probable that some of these ultrasounds did not actually occur and others were not medically necessary.

d.   GLAZER billed for code 93000, Routine EKG including at least 12 leads including interpretation and report, for 1,748 beneficiaries (or more than three quarters of all beneficiaries).  Based on my experience and training, as well as conversations with medical professionals, beneficiaries, and other investigators, it is probable that some of the EKGs did not actually occur and others were not medically necessary.

103. Agents also received a report that detailed GLAZER's DME referring claims data from the period of January 1, 2006, through April 30, 2014.  The report showed the following:

a.   During that time period, DME supply companies billed Medicare approximately $5,488,617 for more than 15,000 DME items purportedly provided to 1,949 beneficiaries, based on prescriptions signed by GLAZER.  As of May 2010, Medicare had

paid those DME supply companies approximately $2,631,470 for that time period.

      b.   Of those billings, approximately $3,800,000 (approximately 73%) were for PWCs and related accessories. Based on my experience and training, as well as conversations with medical professionals and other investigators, I know that PWCs generally are a last resort that should only be used when other DME is not sufficient. The high percentage of PWCs relative to other DME prescribed by GLAZER is an indicator of fraud.

      c.   In addition, GLAZER prescribed a total of more than 1,007 PWCs during this time period. Based on my experience and training, as well as conversations with medical professionals and other investigators, I know that most physicians prescribe very few PWCs. Even physicians working in geriatric populations often prescribe as few as one or two a year. This stands in stark contrast to GLAZER's rate of approximately 134 PWC prescriptions per year. This extremely high number of PWC prescriptions is yet another serious indicator of fraud. Further, as described above, numerous beneficiaries who received PWCs based on GLAZER's prescriptions did not appear to need the PWCs at all.

    104. In addition, agents received a report that detailed GLAZER's home health services referring claims data from the

period of January 1, 2006, through April 30, 2014.  The report
showed that during that time period, HHAs billed Medicare
approximately $16,501,832 on behalf of 1,835 beneficiaries,
based on prescriptions from GLAZER.  Medicare paid HHAs
$16,443,040 based on those claims.

## IV.  CONCLUSION

105. Based on the facts set forth herein, there is probable
cause to believe that beginning in or around January 2006, and
continuing through in or around May 2014, in Los Angeles County,
within the Central District of California, and elsewhere,
defendant GLAZER, together with others known and unknown,
knowingly combined, conspired, and agreed to commit health care
fraud, in violation of Title 18, United States Code, Section
1347.

I declare under penalty of perjury that the statements
above are true and correct to the best of my knowledge and
belief.

_____/S/_____
Janine Li
Special Agent
Federal Bureau of Investigation


Subscribed to and Sworn before me
This __11__th day of May, 2014.

ANDREW J. WISTRICH
_____
HONORABLE ANDREW J. WISTRICH
UNITED STATES MAGISTRATE JUDGE

36